### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

**CASE NO. _____**

**JOSEPH SABAG,**

                        **Plaintiff,**

**v.**


**JUST VISION, INC.,**
**RO CO FILMS INTERNATIONAL, LLC,**
**NAKED EDGE FILMS Ltd.,**
**and JULIA BACHA,**

                        **Defendants.**
_____/

## COMPLAINT

### INTRODUCTION

1.      Defendants created, produced, and distributed a film entitled *Boycott*, which seeks to delegitimize laws adopted in over thirty-six states barring state financial contacts with parties engaging in commercial discrimination against Israel.  *Boycott* attacks these laws in part by portraying them as having been enacted at the behest of the State of Israel and by stating and implying that their proponents achieved these results by violating the law and concealing their actions through subterfuge.

2.      A tactic used by the film to substantiate its argument is the intentional defamation of the Plaintiff, Joseph Sabag, through the false allegation that Mr. Sabag committed a federal crime by serving, but not registering as, a foreign agent of Israel.  Defendants know this claim is not true.  Yet they nevertheless make this claim in *Boycott* by manipulating footage of Mr. Sabag, deleting material parts of that footage to make it appear as if Mr. Sabag was speaking on behalf of

an entity that allegedly received funds from the government of Israel when he clearly was not.  On the basis of this manipulation, the film accuses Mr. Sabag of having evaded a duty to register under federal law as an agent of Israel, and of having purposely failed to fulfill that duty which, had he done what Defendants claim and manipulated the facts to make it appear, would mean he committed a felony.

3.      Plaintiff does not seek to prevent the presentation of the film.  Defendants are entitled to express their opinions.  What they are not entitled to do is to state or imply that Mr. Sabag violated the law, which is precisely what they have done.  This suit seeks only to remedy those false statements and the damage they have done and will do to Mr. Sabag.

4.      The Boycott, Divestment, Sanctions ("BDS") movement promotes economic discrimination against Israel, its trade partners, academic institutions, and individuals.

5.      Federal law, including § 2000d of the Civil Rights Act of 1964, and the law of every state in the United States, bars discrimination against any person on the basis of nationality, ethnicity and religion.

6.      In the wake of the rise of the BDS movement, 37 states adopted laws specifically barring any person who contracts to sell goods or services to those state governments from discriminating against Israel, parties that do business in or with Israel, or Israeli individuals.

7.      *Boycott* is an effort by Defendants to attack these anti-discrimination laws.

8.      Upon information and belief, *Boycott* has been shown at least 180 times around the world and in 28 states in the United States, including Florida.

9.      This suit seeks relief only regarding a six-minute sequence in the film, in which Defendants advance a specific false statement of fact about the Plaintiff, Mr. Sabag.  That manufactured and false claim is that Mr. Sabag was operating as a paid foreign agent of Israel, had

a duty under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, to register as a foreign agent of Israel, and that he purposely breached that duty and did not register.

10.     That claim is false and is known to be false by Defendants.

11.     Plaintiff Joseph Sabag is a well-known and highly respected attorney and policy advocate who provided legal and informational resources to assist many state legislatures considering anti-BDS legislation.

12.     *Boycott*, created and distributed by Defendants, makes the claim that Mr. Sabag intentionally failed to comply with FARA and acted illegally to conceal a supposed agency relationship with Israel.

13.     This constitutes an accusation by Defendants that Mr. Sabag committed a felony violation of federal law.

14.     In an attempt to substantiate this false claim, one or more of the Defendants materially doctored historical footage of Mr. Sabag to make it appear as if he was speaking as a representative of an organization that at the time received funding from the government of Israel, and then Defendants distributed the film. Such conduct, if Mr. Sabag actually engaged in it, would mean that he violated FARA.  Because Defendants made it appear that Mr. Sabag was hiding his supposed funding from Israel while engaged in advocacy on its behalf, they accused him of committing a federal felony.

15.     In fact, the organization that *Boycott* says employed Mr. Sabag allegedly received funding from Israel only after Mr. Sabag moved on from the organization. Simply put, Mr. Sabag never conducted his professional work activities while employed by an entity which was, when Mr. Sabag worked there, receiving the type of funding from the Israeli government described in the film. Defendants' accusation is false.  Evidence, including video footage of Mr. Sabag speaking

publicly, was manipulated by Defendants to make the accusation appear true. The actions of Defendants therefore constitute defamation and libel *per se* because the film falsely asserts that Plaintiff committed a crime, a felony under federal law.

**PARTIES**

16.     Joseph Sabag is a citizen and resident of the State of Florida.

17.     Defendant Just Vision, Inc. (a/k/a Just Vision, Inc.) ("Just Vision") is registered with the Internal Revenue Service as a tax-exempt corporation with its primary business address at 1250 H Street, NW, Suite 300, Washington, D.C. 20005.  It is incorporated in Delaware. Just Vision served as a producer for *Boycott*. During the credits portion of the *Boycott* film, Just Vision is named as the "author of this motion picture[.]" Just Vision is thus responsible, among others, for the film's content.

18.     Defendant Ro Co Films International, LLC (a/k/a "ROCO Films") is a corporation with its primary business address at 80 Liberty Ship Way, Sausalito, California 94965-3317 ("Roco Films"). It is incorporated in California.  ROCO Films is listed in the opening title sequence for the film in question. Opening title sequences typically identify the primary individuals and/or entities involved in producing a film. ROCO Film's website states that it is "a global documentary distribution agency." Upon information and belief, Roco Films acted as a producer for *Boycott* and is responsible, among others, for its content and/or served as an agent to distribute the film thus ensuring the dissemination of the defamation complained of herein.

19.     Defendant Naked Edge Films Ltd. ("Naked Edge Films") is a corporation with its primary business address at 1295 S Broadway Street, Suite B, Boulder, Colorado 80305.  It is incorporated in Colorado.  Naked Edge Films is listed in the opening title sequence for the film in question. Naked Edge Film's website lists *Boycott* as one of "our films," and states that one of its

founders, Daniel Chalfen, served as a producer for *Boycott*. Naked Edge Films, among others, is thus responsible for its content.

20.     Defendant Julia Bacha is an individual with a principal residence at 425 West End Avenue, Unit 5B, New York, NY 10024, and served as the director and producer for *Boycott*.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because Plaintiff and all Defendants are citizens of different states and the value of the relief sought exceeds $75,000.

22.     This Court has personal jurisdiction over the Defendants because upon information and belief they continuously and systematically operate, conduct, engage in, and carry on business in Florida.  The Court also has specific personal jurisdiction over Defendants because their wrongful conduct at issue in this lawsuit occurred in Florida, including screenings of *Boycott* in Florida.  Accordingly, Defendants are subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193.

23.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff's causes of action accrued within this judicial district and a substantial part of the events and acts giving rise to Plaintiff's claim occurred here, including that Plaintiff is a Florida citizen who resides in this district, and Defendants' wrongful acts impacted Plaintiff in this district.

## FACTS

### A.     The BDS Movement

24.     The BDS Movement builds on decades of Arab boycotts of Israel.

25.     *Boycott* addresses the BDS campaign.

26.     Thirty-seven states adopted laws barring those states from doing business with any

person engaging in economic discrimination against Israel.

27.     These statutes prevent U.S. states, in their own business activities, from committing discrimination against persons on the basis of their Israeli nationality.

28.     Both the U.S. Senate and the U.S. House have condemned efforts to boycott Israel. The Senate passed S.1, which contained anti-boycott provisions, on January 28, 2019, by a vote of 74-19. The House passed a resolution condemning the boycott of Israel on July 24, 2019, by a vote of 398-17. In addition, a bi-partisan collection of legislators introduced the Combating BDS Act of 2023, which is currently pending before Congress.

**B.      Production of *Boycott***

29.     *Boycott* was upon information and belief produced by Defendants Just Vision and Naked Edge Films. Defendant Ro Co Films also appears in the opening title sequence identifying producers of the film, meaning those who gave material support to the film, and, upon information and belief, participated in the dissemination of the film and its defamatory content. The film was directed by Defendant Julia Bacha.

30.     Upon information and belief, each of the Defendants were aware of the content of the film prior to its release.

31.     The film depicts three efforts to challenge laws restricting BDS.

32.     The film interweaves its narratives of these challenges with several doctored segments of Mr. Sabag's efforts to assist states in their quest to forbid state participation in the discriminatory goals of BDS. The film attempts to make it appear that the efforts by Mr. Sabag constituted lobbying efforts by a foreign agent.

**C.      Mr. Sabag's Employment History and Advocacy Against BDS Economic Warfare**

33.     Mr. Sabag worked as the U.S. National Director for the Israeli Allies Foundation

("IAF") from December 2014 until approximately November 2018. The organization provides educational and informational resources to policymakers and public advocates who support the U.S.- Israel relationship, and works with legislators on issues involving U.S.-Israel affairs.

34. During Mr. Sabag's tenure at IAF, the organization did not receive any funding from the State of Israel or any subdivision thereof. During his employment with IAF, Mr. Sabag took steps to ensure compliance with FARA and other applicable laws. He ensured that neither he nor any entity with which he was associated received funds implicated under FARA and that he and IAF were in full compliance with the statute.

35. Mr. Sabag left IAF's employ in or about November 2018, at which time he became the Executive Director of the Israeli American Coalition for Action ("IAC for Action"). IAC for Action is a non-profit, non-partisan organization dedicated to strengthening the U.S.-Israel relationship. This organization has never received any funds from any branch of the Israeli government.

36. Mr. Sabag does not now work for an organization which received funding from the State of Israel, nor was he engaged in an agency relationship with the State of Israel. Further, at no time during which he worked for any other organization did it receive funding from the State of Israel nor was any such entity engaged in an agency relationship with the State of Israel, as defined by FARA, or otherwise.

37. Part of Mr. Sabag's efforts has been to provide legal and informational resources for states seeking to ensure they are not engaging in commercial boycotts advocated by the BDS Movement. In that role, he worked with legislators and legislatures nationwide to explain the discriminatory history and commercial function of that movement. And in the same spirit that impelled the efforts of the Uniform Laws Commission to design laws that could be adopted by

states nationwide (*e.g.*, the Uniform Commercial Code), Mr. Sabag has, after lengthy research, helped to design model state legislation that would protect state interests and taxpayer funds from exposure to the destructive commercial effects of BDS.

38.     Mr. Sabag is shown in *Boycott* providing testimony to a subcommittee of the Arizona legislature on March 20, 2019, while employed by the IAC for Action. Mr. Sabag appeared before the subcommittee to provide advice on the amendment of the existing anti-BDS statute.

39.     However, the Arizona hearing footage was doctored in several ways. First, the raw footage of the Arizona hearing includes Mr. Sabag's introduction of himself as leading "an organization called IAC for Action." Of critical importance, the *Boycott* film doctors the original historical footage by deleting the audio portion of the clip wherein Mr. Sabag verbally identifies his employer.   Instead of allowing Mr. Sabag's actual video statement to identify his employer truthfully, a caption was falsely inserted into the clip which states that he is "Joseph Sabag, US National Director, Israel Allies Foundation."  In fact, by March 2019, Mr. Sabag was not employed by the IAF and the original, actual footage did not contain such text.

40.     Immediately after the 2019 Arizona subcommittee hearing scene, *Boycott* shows a video clip of Mr. Sabag talking about anti-BDS legislation, this time in Florida. This clip of Mr. Sabag is from three years prior—March 2016—and in this clip Mr. Sabag correctly identifies himself as representing IAF at that time—to reinforce the false claim that Mr. Sabag was representing the IAF in the Arizona subcommittee hearing clip three years later. In the 2016 video, Mr. Sabag identifies himself as representing the Israel Allies Foundation and no date is given either verbally or in text.

41.     The videos are inserted in reverse order so as to reinforce the manipulation of the

2019 video and the false portrayal of Mr. Sabag as being employed by the IAF at that time. As alleged above, however, Mr. Sabag had left the IAF and was then working for IAC for Action when he spoke in Arizona.  He was no longer affiliated with the IAF in March 2019.

42.     *Boycott* asserts that IAF received funds from the government of Israel.

43.     The clear message of the doctored videos as shown in *Boycott* is that Mr. Sabag was working for IAF in March 2019 when presenting before the Arizona legislature, after IAF allegedly received funding from the government of Israel.

44.     *Boycott* makes this knowingly false claim in order to justify its accusation, later in the film, that Mr. Sabag was a beneficiary of the Israeli government's funding of some pro-Israel organizations in the United States which were engaged in fighting the BDS movement.

45.     To advance this false accusation against Mr. Sabag, a commentator in *Boycott* says that Israel's efforts in this regard were specifically intended to hide violations of FARA, and that "the [Israeli] Ministry of Strategic Affairs was fully aware that this was a problem with the laws of the United States of America." The film then includes a graphic stating that pro-Israel organizations in the United States—including specifically IAF, which is identified on the screen at this point in the film—conspired to receive funding from the government of Israel. The film links this alleged violation to Mr. Sabag personally and specifically by, in the same section of the film discussing the FARA issue, including a clip of Mr. Sabag (which the film claims to be from February 2017) speaking on behalf of the IAF.

46.     *Boycott* simultaneously represents that the IAF was contemporaneously receiving funds from the government of Israel in violation of FARA; that Mr. Sabag was affiliated with IAF at the time that entity was receiving Israeli government funds; and that while working for the IAF, Mr. Sabag was presenting advice on anti-BDS legislation to the Arizona legislature.

47.     However, no efforts or activities by Mr. Sabag, including his efforts in March 2019, were ever funded by the state of Israel. Mr. Sabag is an American helping to provide expert informational resources to other Americans on an issue rooted in American values, goals, and ideals: combatting discrimination and hatred.

## COUNT I
## DEFAMATION, DEFEMATION BY IMPLICATION AND LIBEL *PER SE*
### Against All Defendants

48.     Plaintiff incorporates by reference paragraphs 1 through 47 as if fully set forth herein.

49.     Defendants made and published statements of fact as set forth above, which were false, namely asserting that Mr. Sabag and/or his employer had received funding from a foreign government while he was engaged in lobbying on behalf of that foreign government without making disclosures required by FARA—in effect misrepresenting that Mr. Sabag committed a felony.

50.     Defendants caused to be published the above-described defamatory statements about Mr. Sabag.

51.     Defendants' statements were defamatory in that they reflected shame, contumely, and disgrace upon Mr. Sabag and exposed him to distrust, hatred, contempt, ridicule, and obloquy by misrepresenting that he acted in violation of a federal criminal statute.  Defendants' statements about Mr. Sabag were defamatory because they tend to harm his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

52.     Defendants' statements were defamatory and libelous *per se* in that they were and are incapable of an innocent meaning and that they charged Mr. Sabag with the commission of a crime which he did not in fact commit, and were imputations which would foreseeably affect his

business, trade, profession, and/or office.

53.     Defendants' statements also defamed Plaintiff by implication by juxtaposing a series of facts so as to imply a defamatory connection between them and by creating a defamatory implication by omitting facts.

54.     Defendants' statements with respect to Mr. Sabag were false in that Mr. Sabag did not commit the felony of which Defendants have accused him.

55.     Defendants made and published the defamatory statements with actual malice, that is, actual knowledge of the falsity of their statements or, at a minimum, with reckless disregard of the truth or falsity of the statements. In fact, the defamatory statements at issue here were created by Defendants through the manipulation of what had been accurate video clips, in order to make it appear as if Mr. Sabag committed a felony when in fact he had not.  Defendants knew the actual facts and so knew that their accusation that he committed a federal crime was false. This act by Defendants constitutes the commission of affirmative acts to create a defamatory statement, which subsumes the *mens rea* required to make out an act of defamation.

56.     In addition, counsel for Mr. Sabag wrote to Defendants, apprising each of them of the misrepresentations, but each failed to take remedial action to remove the misrepresentations from the public sphere and to undo the damage they caused.

57.     Defendants caused injury and actual damages to Mr. Sabag by creating through manipulation, and then publishing and distributing, the false defamatory statements.

**COUNT II**
**CONSPIRACY TO DEFAME, DEFEME BY IMPLICATION AND LIBEL**
**Against All Defendants**

58.     Plaintiff incorporates by reference paragraphs 1 through 47 as if fully set forth herein.

59.     Defendants conspired and agreed to make and publish statements of fact as set forth above, which were false, namely asserting that Mr. Sabag and/or his employer received funding from a foreign government while he was engaged in lobbying on behalf of that foreign government without making disclosures required by FARA—in effect misrepresenting that Mr. Sabag committed a felony.

60.     Defendants' statements were defamatory in that they reflected shame, contumely, and disgrace upon Mr. Sabag and exposed him to distrust, hatred, contempt, ridicule, and obloquy by misrepresenting that he acted in violation of a federal criminal statute. Defendants' statements about Mr. Sabag were defamatory because they tend to harm his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

61.     Defendants' statements were defamatory and libelous *per se* in that they were and are incapable of an innocent meaning and that they charged Mr. Sabag with the commission of a crime which he did not in fact commit, and were imputations which would foreseeably affect his business, trade, profession, and/or office.

62.     Defendants made and published the defamatory statements with actual malice, that is, actual knowledge of the falsity of their statements or, at a minimum, with reckless disregard of the truth or falsity of the statements. In fact, the defamatory statements at issue here were created by Defendants through the manipulation of what had been accurate video clips, in order to make it appear as if Mr. Sabag committed a felony when in fact he had not. Defendants knew the actual facts and so knew that their accusation that he committed a federal crime was false. This act by Defendants constitutes the commission of affirmative acts to create a defamatory statement, which subsumes the *mens rea* required to make out an act of defamation.

63.     Defendants did one or more overt acts in furtherance of this conspiracy, including

publishing and distributing the false statements set forth above.

64.     Defendants caused injury to Mr. Sabag by conspiring to create and creating through manipulation and publishing and distributing the false defamatory statements.

## DEMAND

65.     Plaintiff demands the following:

a.     damages in an amount to be determined at trial;

b.     a declaration that the statements and implications about Plaintiff in the film *Boycott* are false and defamatory;

c.     an injunction against Defendants, *inter alia*, prohibiting republication of the false and defamatory statements at issue regarding Mr. Sabag; mandating the removal of the false and defamatory statements from *Boycott*, as well as corrective notice to any individual person or entity that received a copy of the false and defamatory statements;

d.     Attorneys' fees and/or costs as allowed by law; and

e.     Such other and further relief as the Court may deem just or proper.

Dated this 10th day of November, 2023.

Respectfully submitted,

/s/ David Buckner
David M. Buckner, Esq. (Fla. Bar No. 60550)
BUCKNER + MILES
2020 Salzedo Street, Suite 302
Miami, Florida 33134
Telephone: 305.964.8003
Facsimile: 786.523.0485
Email address: david@bucknermiles.com

Law Office of Mark P. Schnapp, PLLC
Mark Schnapp, Esq. (Fla. Bar No. 501689)
c/o Michael Shawn, Esq.
929 Alton Road
Miami Beach, Florida 33139

Telephone:  305.206.0039
Email address:  mark@markschnapplaw.com

Jerome M. Marcus (pro hac vice to be filed)
  *Pa. Bar No. 50708*
Lori Lowenthal Marcus (pro hac vice to be filed)
  *Pa. Bar No. 53388*
Daniel C. Simons (pro hac vice to be filed)
  *Pa. Bar No. 86861*
MARCUS & MARCUS, PLLC
P.O. Box 212
Merion Station, PA 19066
Telephone: 215.664.1184
*jmarcus@marcuslaw.us*
*dsimons@marcuslaw.us*

*Counsel for Plaintiff*

14